CROSSLAND FEDERAL SAVINGS BANK BY the FEDERAL DEPOSIT INSURANCE CORPORATION as Conservator, Plaintiff,

v.

LOGUIDICE–CHATWAL REAL ESTATE INVESTMENTS CO., Frank M. Loguidice, Robin Marmon Loguidice, Frank C. Loguidice, Rosalind Loguidice, Sant Chatwal, Pardaman K. Chatwal, 305 East 92nd Street Corp., Mass. Electric of New York, Master Mechanical Contractor, Inc., Firedoor Corp. of America, Mass. Electric Construction Company, Anthony Marino Construction Corp., the City of New York, the People of The State of New York, Defendants.

No. 92 Civ. 6727 (RPP).

United States District Court,
S.D. New York.

Sept. 27, 1993.

**414**

Shea & Gould by Stephen Lew, New York City, for plaintiff.

Dahan & Nowick by David R. Taxin, New York City, for defendants LoGuidice–Chatwal Real Estate Investments Co. and The LoGuidice defendants.

Robinson Brog Leinwand Reich Genovese & Gluck, P.C. by Robert M. Milner, New York City, for defendants Sant Chatwal and Pardaman K. Chatwal.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This proceeding initiated in Supreme Court, New York County, and removed to this Court is brought by Crossland Federal Savings Bank by the Federal Deposit Insurance Corporation ("FDIC") as Conservator ("Crossland FDIC")[1] pursuant to Section 1371 of the New York Real Property Actions and Proceedings Law ("RPAPL") for a deficiency judgment against the defendant LoGuidice–Chatwal Real Estate Investments Co. ("LoGuidice–Chatwal"), a partnership, and the individual defendants.

### Background

During the period 1986 to 1988, The Milan, a 15–story apartment building, was constructed on property owned by LoGuidice–Chatwal in the Chelsea section of Manhattan at a cost of $16,747,734.18. Although its apartments and other units were offered for rent upon completion, the building was designed for conversion into three separate condominium units—residential, retail space, and community space.[2] Due to its plans for community space for medical facilities the partnership obtained a Section 421A Real Estate Tax Exemption.

Upon completion of construction, LoGuidice–Chatwal obtained a mortgage guaranteed by the individual defendants from Crossland Federal Savings Bank ("Crossland") of $11,000,000 on the property. Crossland was subsequently placed in receivership by the FDIC which then transferred the mortgage to Crossland FDIC.

LoGuidice–Chatwal was unable to make payments to Crossland FDIC as required by the terms of the mortgage. Crossland FDIC initiated a foreclosure action against the Milan. Thereafter, in February 1990, LoGuidice–Chatwal filed a Chapter 11 petition in the Bankruptcy Court for the Southern District of New York. On July 25, 1991, Bankruptcy Court Judge Abram entered a judgement of foreclosure and sale of the property. On December 4, 1991, a foreclosure sale was held pursuant to Section 1371 of the RPAPL. Crossland FDIC, the highest bidder, purchased the property for $5,250,800 at the foreclosure sale. Crossland FDIC now seeks a deficiency

---

**1.** Crossland FDIC is the successor-in-interest to Crossland Savings FSB and its wholly owned subsidiary Cross–Milan Holding Corp.

**2.** The Milan's design won awards for excellence. Many of its features were luxurious to enhance its attractiveness for condominium ownership.

judgment after foreclosure for the difference between the amount owing on the mortgage and the sale price.[3] Defendants contend that the "fair and reasonable market value" of the property was higher than the sale price.

Trial was held on February 8, 25, March 2, 4, 16, 1993 and the parties then submitted post trial memoranda.

### Plaintiff's Appraisal

The principal evidence at trial offered by plaintiff was testimony and an expert appraisal by Martin H. Whalen, a Senior Vice President of CB Commercial Real Estate Group, Inc. with ten years experience in real estate, who valued the Milan as of December 4, 1991, the foreclosure sale date, by both the sales comparison approach and the capitalized net income approach. Using the net income approach, based on the November 26, 1991 rent roll and expense records of the Milan provided by the receiver's managing agent, Friedman Management Corp., Mr. Whalen capitalized net income at 7% to arrive at an appraised value of $4,500,000. Using a sales comparison approach to six "comparable" rental buildings, after making various adjustments for location, etc., Mr. Whalen arrived at an appraised value of $5,500,000. He then reconciled his two approaches and arrived at an appraisal value of $5,000,000 for the Milan as of December 4, 1991. Mr. Whalen testified that in making his appraisal, he did not review a 1988 appraisal of the Milan by Mr. Zarembo, then First Vice President of Coldwell Banker Real Estate Advisory Services or his own appraisal of the Milan as of March 6, 1991, which valued that property at $8,600,000. Mr. Whalen testified that he could not quantify the rate of decline in real estate values from 1988 to December 1991, and also explained the higher valuation in his appraisal of March 6, 1991 as due to its use of incomplete expense records, particularly as regards real estate taxes, which caused overall expenses to be understated in the March 1991 appraisal.

### Defendants' Proof

Defendants presented two expert witnesses. The first, David Scribner, Jr., a real estate appraiser of over 30 years experience and Director of Academic Affairs, Master of Science and Real Estate Program, New York University, testified that the real estate market in 1989, 1990 and 1991 was so depressed that no market value as defined in the federal Financial Institution's Reform, Recovery and Enforcement Act ("FIRREA") existed for the Milan at the time of the foreclosure sale.[4] He took the position that the last value which met the FIRREA definition was in 1988 and that consequently that value should be utilized in order to establish the amount, if any, of the deficiency judgment.

Under New York law the fact that the market is depressed does not mean that a market value cannot be determined. In *Heiman v. Bishop*, 272 N.Y. 83, 4 N.E.2d 944 (1936), Mr. Scribner's position was considered and rejected by the New York Court of Appeals. The Court of Appeals, in remanding the case for a computation of a deficiency judgment, recognized that "during the depression, ordinary conditions have not existed in the real property market. Conditions in that market have been extraordinary and unprecedented" *Id.* at 87, 4 N.E.2d 944. The Court held that to utilize the nearest earlier date, and the method utilized by the referee below in *Heiman* and argued for here by Mr. Scribner, would have the effect of depriving mortgagees of deficiency judgments in practically all cases which, the Court found, the legislature could not have intended. Accordingly, the *Heiman* court determined that the market value of real property must be determined by any intrinsic evidence relevant to the property's market value as of the foreclosure sale's date, even if sales data is unavailable due to the depressed market. The principles asserted

---

**3.** Crossland FDIC also seeks an order confirming the Referee's Report of Sale which defendants have not opposed.

**4.** Mr. Scribner excluded individual condominium and cooperative apartment sales as irrelevant to the value of the Milan. (Exh. E at 4).

in *Heiman* have been adhered to in New York under CPA 1083(a) and its successor provision, RPAPL 1371(2). *Farmers Nat'l Bank of Malone v. Tulloch*, 55 A.D.2d 773, 389 N.Y.S.2d 494 (3d Dep't 1976); *First Nat'l Bank of Cortland v. Intermont, Inc.*, 53 A.D.2d 760, 384 N.Y.S.2d 259 (3d Dep't 1976).

Defendants' second expert witness, Henry Boeckmann, President of Henry Boeckmann Associates, a real estate appraiser for over 25 years, testified to his appraisal of the Milan on March 13, 1990, over 18 months before the foreclosure sale. The March 1990 appraisal was based on a forecast of a recovery from a weak market in early 1990, which did not occur. (Exh. K at 12). As a result, Boeckmann over estimated gross income in 1991 by over 30%. Thus, the Boeckmann appraisal and testimony cannot be used to arrive at a December 4, 1991 value.

Defendants also rely on an order by Bankruptcy Judge Prudence Abram on July 24, 1990, which stated that the value of the Milan was in the 13 and 14 million dollar range in the course of making a judicial determination that 23rd Street Holding Co. had no equity in the property at that time and that a receiver should be appointed. Judge Abram had heard appraisal testimony from Mr. Boeckmann and Coldwell Banker before issuing that order.

No factual findings accompany the order of Judge Abram so this Court cannot determine the degree to which she made a true evaluation of the property or made her finding merely because that finding was all that was necessary to permit the order of receivership to be entered. In any event, the valuation on June 20, 1990 is only considered as some evidence of what the property's value might be on December 4, 1991.

Defendants' last argument relates to the value of its proposed sale in 1988 of the residential condominium part of the property for $13.8 or $13.5 million. Needless to say, the proposed sale never went through, was over three years prior to the foreclosure sale, and is little evidence of the value of the Milan on December 4, 1991.

The Court finds the defendants' proof at trial does not establish any value for the Milan as of December 4, 1991, but does cast doubt on the validity of the appraisal of Mr. Whalen (Exh. 6) which proof together with his testimony requires close examination of its assumptions.

**Analysis of the Plaintiff's Appraisal Testimony**

For appraisal testimony, plaintiff relied exclusively on the appraisal of Martin Whalen, First Vice President of CB Commercial Real Estate Group Inc. and a member of the Appraisal Institute, as to the market value of the leased fee interest of the owners of the Milan on December 4, 1991. In his appraisal as of that date 'the leased fee interest' is defined as "[a]n ownership interest held by a landlord with the right of use and occupancy conveyed by lease to others; usually consists of the right to receive rent and the right to repossession at the termination of the lease." (Exh. 6 at 1).

Mr. Whalen's appraisal, states that, the definition of "market value" to be utilized for determining the Milan's value is that stated by the Board of Governors of the Federal Reserve System as follows:

The most probable price which a property should bring in competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised and acting in what they consider their own best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

(Exh. 6 at 2; also published at 55 Fed.Reg. 27762 (1990) pursuant to The Financial Institution Reform, Recovery and Enforcement Act of 1989).

This definition of "market value" was accepted by all parties to be the definition to be applied.

Mr. Whalen's appraisal reported on the Milan's "marketability" as follows:

The marketability of the subject property was good. It was a new building with rents that represented the market. The subject property participated in a real estate tax reduction program that legislatively guaranteed that the building will be vacancy decontrolled from New York State's Rent Stabilization laws upon expiration of the tax benefits. This removed most of the risk of a long-term investment in the subject property compared to other residential rental projects in New York City. The subject's overall appeal to the market was above average, and it would have required less than twelve months to sell if priced at its market value as of the listing date.

(Exh. 6 at 2).

Despite this estimate of the Milan's marketability and estimate of time within which it could sell at its "market value," all the comparable sales utilized by Mr. Whalen to determine the Milan's value were over 12 months prior to December 4, 1991, except for comparable sale number 1, a sale of property located at 310 East 24th Street on February 11, 1991.[5] Mr. Whalen, in his testimony, could not identify any other sales in 1991 of apartment buildings containing 40 or more apartments. Secondly, despite the statement that the building's rent represented the market, the same appraisal reduced those rents in calculating market value by the capitalized net income method.

There are other questionable aspects to Mr. Whalen's appraisal. In his sales comparison approach, Mr. Whalen placed primary reliance on the Beth Israel purchase and on the purchase in August 1989 of 109–117 West 58th Street, New York City, a 100 year old building which had been converted to apartments in 1978 which the appraisal states was 11 years old at time of sale (Exh. 6 at Diagram 7). In his testimony, Mr. Whalen placed greatest reliance on the Beth Israel purchase of 310 East 24th Street, a six-story, twenty-six year old building containing 71 apartments, for $7,000,000. To derive a capitalization rate for the sale for comparable application to the Milan, he did not use actual figures but imputed market rents and expenses to the Beth Israel property. In this connection he reduced the square footage of the building by 15% to obtain rentable square footage and attributed market rents of $25 per square foot per annum to achieve gross income. The $25 per square foot was derived from rents of other buildings in the other areas that he had researched. He then applied a vacancy rate of 5% figuring that this building, like the Milan, had to compete with rent-regulated buildings for tenants. He estimated Beth Israel expenses at $4.00 per gross square foot since it was a non-doorman, one elevator building (Exh. 6 at 54). He also adjusted the sale price down by 15% because he estimated the location to be better than that of the subject property, finding that over time its location will prove more attractive to renters and, therefore, to property owners. He also adjusted the price downward by another 10% because in his opinion the property had a greater value to Beth Israel than the normal buyer.

In contrast, Mr. Whalen, in valuing the subject property, a fifteen-story building constructed in 1988 containing 42 apartments, two elevators, doorman service, television monitoring, central air condition-

---

5. This building was bought by a tenant, Beth Israel Hospital, which leased more than 50% of the units in the building at the time of purchase, and thus, assuming its willingness to assert it would not renew leases, had a bargaining position not usual in transfers of residential apartment buildings.

ing, and ready access to subway and bus transportation, adjusted its annual average rent from $23.64 per square foot to $21.00 per square foot, relying on average rents received at five "comparable" buildings and most heavily on rents at 300 East 34th Street and 330 West 56th Street, both of which were constructed in 1974.

Mr. Whalen was not an impressive witness. His familiarity with real estate appraisals seemed more based on suburban sales than on urban real estate. There were numerous inconsistencies in his testimony. Also, he had failed to conduct a review of the Real Estate Board's record of transactions during the relevant period. The two comparable buildings used in his capitalized net income approach in his March 1991 appraisal (Exh. B), both of which were newly constructed, were not even utilized in his December 1991 appraisal.[6] In the March 1991 appraisal, he utilized 15 comparable sales as opposed to only six comparable sales utilized in his December 1991 appraisal. The difference in appraisals based on a sales comparison approach was $8,700,000 in March 1991 as opposed to $5,500,000 in December 1991.[7] This difference in value in a 8–9 month period of time seems highly unlikely.

Plaintiff sought to bolster Mr. Whalen's testimony by offering evidence of the sale of the Milan after the foreclosure at a price of $5,000,000 in September 1992. This sale must be disregarded. Not only is it 9 months after the foreclosure sale, the testimony showed that the Crossland FDIC employee in charge of the marketing of the property utilized sales material in seeking bids for the property which in some respects disparaged it. (Exh. S and Tr. 550–552). Furthermore, although the sale of the property closed on September 8, 1992, the contract of sale fixing the price was entered into on April 13, 1992. (Exh. 14). In short, it is concluded that insufficient time was permitted to develop a buyer who was not "bottom fishing" and that the property was "unloaded." In Mr. Scribner's opinion, the property should have been on the market for a year and one half in order to maximize its price. In Mr. Whalen's own appraisal a year would be needed.

In view of these facts, and because of the extreme length of time between any sales of apartment buildings in Manhattan in 1989, 1990 and 1991, the Court finds that a reasonable time was not allowed for the exposure of this property for sale on the open market. Thus item 3 of the FIRREA requirements was not met.

In view of this state of the record, the Court makes its own evaluation of the "market price" of the Milan on December 4, 1991.

First, adopting Mr. Whalen's approach to arriving at capitalized net income. These rental values and expenses are found reasonable as of December 4, 1991:

INCOME

| | | | |
|---|---|---|---|
| Residential* | 37,394 RSF | $23.64 | $ 883,994 |
| Retail** | 5,414 GLA | 30.00 | 162,420 |
| Laundry** | | | 3,000 |
| | | | $ 1,049,414 |

VACANCY

| | | | |
|---|---|---|---|
| Residential | (excl. super) at 5% | | ($ 43,007) |
| Super Apt. | 1,009 RSF at $23.64 | | ( 23,853) |
| Retail at 10%** | | | ( 16,242) |
| Laundry** | | | ( 150) |
| | | | ( 83,252) |
| | | Effective gross Income | $ 966,162 |

6. Mr. Whalen gave no explanation for not using these rented comparables in his December 1991 approach. Furthermore, in his March appraisal Mr. Whalen utilized the actual rent for the Milan instead of reducing it by $2.64 per square foot.

7. The incomplete expense figures, which Mr. Whalen testified resulted in the differences in the appraisal using the income approach, are irrelevant to the comparable sales approach.

EXPENSES

Expenses excl.

| | |
|---|---:|
| Taxes & marketing at $4.75 PGSF*** | $ 246,435 |
| Real Estate Taxes** | 284,836 |
| Marketing and leasing commissions** | 2,945 |
| | $ 534,216 |

Net Operating Income $ 431,946

* Actual rent roll 1991, Exh. 6, Diagram 8, as of November 24, 1991.

** From CB Commercial Real Estate Group, Inc., December 4, 1991 Appraisal.

*** From CB Commercial Real Estate Group, Inc., March 20, 1991 Appraisal.

---

A capitalization rate of 6.2% is applied, yielding a preliminary value of $6,970,000. This rate is found to be a reasonable capitalization rate for the Milan in part from Mr. Whalen's analysis of the Beth Israel purchase at 310 East 24th Street, New York City in Exh. 6 and from his prior appraisal in March 1991. (Exh. B). Mr. Whalen used imputed rents of $25 per square foot of rental space for the Beth Israel building at 310 East 24th Street, New York City. Assuming that Beth Israel, a six-story, 26–year old apartment building containing 71 apartments, without centralized air conditioning or doorman with monitor security, less accessible to transportation, commanded the same rents as the Milan, $23.64 per square foot, the sale price of $7,000,000 would then mean its net income was capitalized at approximately 6.5% in February 1991.[8] Furthermore in March 1991, Mr. Whalen used his comparable sales 9, 10 and 14 to derive capitalization rates of 7.2%, 6.4% and 5–8%. (Exh. B at 86). Since 6.5% is the mid point of 5–8% two of the three sales could be said to be at 6.5% in March 1991. Since interest rates declined from March 1991 to December 1991,[9] a 6.2% rate seems reasonable.

After adding the adjustments of $501,000 made by Mr. Whalen (Exh. 6 at 88), an adjusted net value under the income approach would be $7,470,000.

Using Mr. Whalen's comparable sales approach and analyzing the adjustments made in his six comparables, certain changes in those adjustments are required. First, the adjustments of 15% for location and of 10% for the special value in use to Beth Israel Hospital as purchaser are

**8.** In March 1991, Mr. Whalen utilized a rate of $25.00 per square foot for the Milan using two newly constructed comparables, one of which he considered a more desirable location and one of which he considered as a less desirable location. (Exh. B at 83).

**9.** Interest rates in March 1991 and in December 1991 were as follows:

| | March 2, 1991 | December 4, 1991 |
|---|---|---|
| Prime Rate | 8.75–9 | 7.50 |
| Discount Rate | 6.00 | 4.50 |
| Federal Funds | 6.89 | 4.68 |
| 3–Mo. Treas. Bills | 6.10 | 4.36 |
| 6–Mo. Treas. Bills | 6.12 | 4.35 |
| 7–Yr. Treas. Notes | 7.97 | 6.81 |
| 30 Yr. Treas. Bond | 8.27 | 7.89 |
| Telephone Bonds | 9.40 | 8.90 |
| Municipal Bonds | 7.35 | 6.87 |

Source: *Key Rates*, N.Y. Times, Mar. 2, 1991, at 34 and *Key Rates*, N.Y. Times, Dec. 4, 1991, at D12.

deemed unwarranted.[10]  Nevertheless, Mr. Whalen reduced its price of $7 million properly by $283,805 for time of sale to $6,716,195 and also for vacancy decontrol by $1,007,429 [11] to $5,710,000.  These reductions result in a $142 per square foot value for the Beth Israel purchase.  Secondly, although comparable sale 4, 1527–33 Third Avenue is in a considerably more favorable location than the Milan, it should not have been excluded totally from consideration by Mr. Whalen since, amongst his new comparables, it was the only recently constructed building.  After Mr. Whalen's adjustment for location and a further net operating income adjustment, this building's per square foot rental value was $153 per square foot.  Third, the other four comparable sales were for buildings which ranged in age from a quarter of a century (comparable sale 1) to a century (comparable sale 5) and three had no opportunity for rent decontrol.  Comparable sale 5, which was 100 years old, per square foot rental value was $144 before a decontrol adjustment of about 10%.

■ Applying the adjusted Beth Israel square foot value of $142 to the Milan with 51,881 gross square feet, one arrives at a value of $7,367,102 to which must be added the Whalen adjustments of $341,000 (Exh. B at 70) for a comparable sale value of $7,708,102 somewhat less than Mr. Whalen's valuation in March 1991.  Considering both its capitalized net income and the comparable sales approach, the Court finds the market value of the Milan to have been $7,590,000 on December 4, 1991.

Accordingly, the Report of Sale of Referee Erczo, Exh. 4, filed December 18, 1991 in the New York County Clerk's Office is confirmed and a deficiency judgment against defendants in the amount of $9,210,855.64 owed plaintiff, plus interest thereon at the legal rate of 9% from September 18, 1992, shall be entered against the defendants.

IT IS SO ORDERED.

---

10. The buyer could be concerned that, Beth Israel had an unusual advantage as purchaser of that building.

11. The Beth Israel package was almost deregulated, although no documentation was inspected to support this claim.